IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DEONNA M. MAUZY,

                Plaintiff,

        v.                                     Civil Action No. 2:08-CV-75

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.      <u>Background</u>

      Plaintiff, Deonna Mauzy, (Claimant), filed a Complaint on July 2, 2008 seeking Judicial

review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of

Social Security, (Commissioner).[1]  Commissioner filed his Answer on December 16, 2008.[2]

Claimant filed her Motion for Summary Judgment on January 15, 2009.[3]  Commissioner filed his

Motion for Summary Judgment on February 11, 2009.[4]

B.      <u>The Pleadings</u>

      1.      <u>Claimant's Brief in Support of Motion for Summary Judgment</u>.

      2.      <u>Commissioner's Brief in Support of Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 10.

[3] Docket No. 13.

[4] Docket No. 17.

3.    <u>Claimant's Response to Commissioner's Motion for Summary Judgment</u>[5]

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence exists to support the ALJ's decision.  Specifically, the ALJ's handling of the psychological evidence from Thomas Stein, Ed.D. was not cause for remand.  Furthermore, the ALJ considered all of Claimant's severe impairments; his RFC finding included all of Claimant;s limitations; and he did not improperly reject the treating psychiatrist's opinion.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.    <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DIB) on December 10, 2004 alleging disability since April 1, 2003 (Tr. 64-68), due to depression (Tr. 76).  The claim was denied initially on April 7, 2005 (Tr. 33).  Thereafter, on June 7, 2005, Claimant filed a Request for Reconsideration.  (Tr. 40).  The claim was denied upon reconsideration on August 17, 2005.  (Tr. 42).  Claimant filed a written request for a hearing on October 4, 2005 (Tr. 47).  Claimant's request was granted and a hearing was held on June 6, 2006 (Tr. 53, 369-419).

The ALJ issued an unfavorable decision on December 29, 2006 (Tr. 19-30).  On January 29, 2007, Claimant filed a request for review of that determination.  (Tr. 17).  The request for review was denied by the Appeals Council on May 8, 2008 (Tr. 6-9).  Therefore, on May 8,

---

[5] Docket No. 19.

2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on July 29, 1970 and was thirty-two (32) years old as of the onset date of her alleged disability and thirty-seven (37) as of the date of the date of the Commissioner's final decision.  (Tr. 73).  Claimant was therefore considered a "younger person," under age 50, under the Commissioner's regulations at all times relevant to her claim.  20 C.F.R. §§ 404.1563(c), 416.963(c) (2008).  Claimant graduated high school and has past relevant work as a general laborer in a chicken factory as well as a lab technician and an optician. (Tr. 374, 77, 95).

C.    Medical History

The following medical history is relevant to issues relevant to the disposition of the case:

**Pendleton Community Care, Mary Bland, M.D. (Tr. 126-165, 315-321, 342-343)**

Dr. Bland, as well as Joan E. Lanier, CFNP, Anne Peterie, CFNP, Susan J. Houck, FNP, Paul West, DO, J. King Seegar, M.D. and Brian Sebastian, M.D. treated Claimant at Pendleton Community Care from January 16, 1997 to March 27, 2006 for mood issues such as depression and anxiety, and headaches.

12/16/02 - Claimant doing "fairly well" on Zoloft.
11/21/02 - Claimant treated for closed head injury and depression.
11/14/02 - Claimant treated for depression.
11/06/02 - Depressive Disorder.
09/09/02 - Fatigue, "maybe secondary to hypothyroidism."
06/04/02 - Mild case of Eczema
05/17/02 - Chronic sinusitis and hypothyroid.
08/15/02 - Muscle strain.
03/13/02 - Hypothyroid.
12/15/01 - Headaches.
11/30/01 - Head injury.  Dr. Sebastian remarks "I truly believe this is musculoskeletal problem with neck spasm and would prescribe muscle relaxant.
08/29/01 - Bacterial vaginosis.

08/16/01 - TMJ, Possible yeast vaginitis and history of chest pain.
03/07/01 - Post-concussion syndrome.
03/01/01 - Symptomatic head trauma post 30 days, possible post-concussion syndrome, hypothyroidism and possible whiplash secondary to fall and head trauma.
02/16/01 - Hypothyroid and question depression
12/23/00 - Hypothyroid.
10/09/00 - Hypothyroid.
03/14/00 - Complaint of sore breast.
01/21/99 - Depression.
12/16/98 - Costochondritis and history of depression.
11/10/98 - Depression "fair control" and headaches "good control."
09/14/98 - Depression situational in nature, recurrent headaches probable tension and question irritable bowel.
08/03/98 - Recurrent headaches probable tension in nature, depression fair control on Paxil and situational problems.
07/23/98 - Depression poor control, headaches poor control and many situational problems which contribute to depression.
06/07/98 - Syncopal episodes and new onset hearth murmur
06/15/98 - Headache, anxiety, nausea and vomiting and cheilosis.
04/06/98 - Depression good control with Paxil, headaches manageable at present with Ibuprofen and hypokalemia resolved.
03/10/98 - Headache idiopathic, stress/depression.
03/06/98 - Headache question tension headache versus migraine.
01/16/97 - Nicotine dependence, palpitations with occasional chest pain, depression and insomnia.
09/30/05 - Hypothyroidism.
10/08/03 - Questionable shingles on the abdomen.
06/04/03 - Depression/anxiety.
03/10/03 - Depression/anxiety and whiplash.
01/13/03 - Depression, hypothyroidism, fatigue and diarrhea.
03/27/06 - Glossitis/temporomandibular joint dysfunction.

### **North Fork Primary Care (Tr. 166-176)**

Claimant was treated for ongoing mood issues from July 18, 2003 through August 26, 2004.

### **Mental RFC, Joseph Kuzniar, EdD (Tr. 177-194)**

Dr. Kuzinar completed a Mental Residual Functional Capacity Assessment form on March 24, 2005. Claimant was noted to be moderately limited in several areas. Dr. Kuzinar also completed a Psychiatric Review Technique (PRT) form.
Claimant was no more than moderately limited in "understanding and memory," "sustained concentration and persistence," "social interaction" and "adaptation." Dr. Kuzinar remarked that Claimant had the capacity to understand, remember and carry out 1-3 routine instructions within

a low social interaction.

Dr. Kuzinar's Psychiatric Review Technique showed mild limitations restricting Claimant's activities of daily living as well as moderate limitation in maintaining social functioning and maintaining concentration, persistence or pace.

## RFC (Tr. 195-202)

Unidentified source at the request of the state agency.

No exertional, postural, manipulative, visual, communicative or environmental limitations established.

## Frederick S. Raines, M.D. (Tr. 203-269, 290-313, 348)

Dr. Raines was Claimant's treating psychiatrist. He treated her from April 11, 2003 through March 30, 2006. He treated her for multiple mental health issues.

## Harrisonburg Medical Associates (Tr. 276-289)

Claimant was treated here from January 17, 2002 through April 11, 2006. She was seen by Glenn E. Deputy on January 17, 2002 when she reported hitting her head on ice and being involved in a motor vehicle accident, causing headaches and pain. On February 27, 2002, Claimant was noted to continue with both headaches and neck pain. She was seen on April 11, 2006 for an unexplained tongue bite, headaches, neck pain and imbalance.

## Rockingham Memorial Hospital (Tr. 324-332)

Claimant was seen in the emergency room on April 1, 2006 for a headache and was subsequently diagnosed with anxiety, bipolar disorder and posttraumatic stress disorder.

## Thomas Stein, Ed.D. (Tr. 349-358)

Consultative psychological examination completed on July 31, 2006. Dr. Stein noted Claimant to have a depressed and anxious mood; to display lability and tears; mild paranoid and jealously delusional thinking; preoccupations, obsessive thinking and phobias; auditory hallucinations; poor judgment; poor concentration; and constant foot shaking and hand wringing. She was diagnosed with Bipolar Affective Disorder, Posttraumatic Stress Disorder, and pain disorder. No limitations were found on the mental RFC form.

D.      Testimonial Evidence

        Testimony was taken at hearings held on June 6, 2006 The following portions of the

testimony are relevant to the disposition of the case:

Q       And is it correct that there'd be five persons living in your home?

A       Yes.

Q       Would you tell the Court briefly about your educational background?  What year

of school did you complete?

A       I graduated in 1989.

                        *               *               *

Q       Did you have any vocational training?

A       Not really.  I only took auto shop.

Q       And that was during high school?

A       Right, that was during high school.

Q       Do you have any on-job training?

A       I was a lens tech, lab tech for LensCrafters and Four Eyes Optical, but that was

just on-job.

Q       But you did receive some training at that job?

A       Yes, I did.

Q       Can you read and write?

A       Yes, I can.

Q       Are you able to drive?

A       Not at this time, no.

Q       And will you explain to the Court, what do you mean, not at this time?

A       I had my driver's license taken away for six months due to seizures.

*         *         *

Q      Do you smoke?

A      Yes, I do.

Q      And how much do you smoke?

A      About a half pack a day.

Q      Do you drink?

A      No, I do not.

*         *         *

Q      Just briefly, for the record and the Court's benefit, let me ask you about your employment history.  When was your last income-producing job?

A      I worked at LensCrafters as a lab tech in 1999.

Q      And how long did you work at that job?

A      From May of 1999 until July of 1999.

Q      So you were there just several months?

A      Yes.

Q      What were your duties during that job?

A      I was a lab tech.  I made the glasses, which was, you had to make the lenses, you put them in the frames, and I had to work with chemicals, heavy machinery, tools.

*         *         *

ALJ      The work at LensCrafters is not of sufficient duration to be relevant in our determination.  It's only two months.  From what she said previously.

ATTY      Yes, Your Honor.

ALJ          Okay.

                              *              *              *

Q          And I'll come back to that in a moment and follow up on that, but just going back to your work history briefly, prior to that job, where did you work?

A          Wampler's.

Q          And what were your duties, and what type of work did you do there?

A          I worked as a line deboner.  I deboned turkeys.  And they were heavy turkeys.  It came across the line, and you had to take the turkey off the line, you would cut it up to get the bones out of it, the skin off of it; and then, it went down onto the line.  It would transfer around the line, the different things on the line.  It was cold.  It was in a freezer.  It was wet and miserable.

Q          Did that job require a lot of standing during the day?

A          I stood all day long.

Q          Did it require a lot of concentration - -

A          Yes.

Q          - - to keep up with the  - -

A          You had to keep up with the line.

Q          So, you had to be there consistently and regularly?

A          Um-hum, yes.

Q          Had a lot of lifting in that job?

A          The heavy turkeys, yes.

Q          And how much would they weigh?

A       An average turkey breast, some of them that would come down the line would be about 10, 12 pounds.   They were heavy.

Q       Now, after the Wampler job, where did you work next?

A       I went to LensCrafters.

Q       And how long were you there?

A       At LensCrafters?

Q       Yes.

A       For about two months, May to July.

*               *               *

BY ATTORNEY:

Q       What were your duties at Hanover Shoe?  What - -

A       I made shoes, men's shoes.  I was a crowner. I had to make sure that the shoes were properly made.  And then, from crowning, I went on cementing.  I had to use chemicals to cement the shoes and put the soles in the shoes.

Q       Did that job require a lot of standing?

A       Yes.

Q       How many hours during an eight-hour workday?

A       We got 10-minute breaks twice a day, and a half-an-hour lunch break.  And if the line was stopped, they let us go outside.  That was very seldom, though.

Q       Did you stand to perform that job?

A       Yes, I did.

Q       Did that job require a lot of lifting?

A    Yes, yes.

Q    Ability to concentrate and keep up with the assembly line?

A    I had to keep up with the assembly line.

Q    Now, for the Court's benefit, prior to that, which job did you have?

A    I had Four Eyes Optical, is where I worked. I worked there from 1992 to 1994.

Q    Now, what were your duties at that job?

A    I was a salesperson. I was also a technician for the glasses. When a customer would come in, I would sit them down, fit them for frames, get their prescription, write their prescription up, ask them what type of lenses they would like to have, tell them what we had. I also dispensed glasses, which means, if a person had come in, I would fit their glasses to their face to make sure it fit, tighten up the screws in the glasses, and then, set them on.

Q    Now, in all those jobs, did you have to interact with other people?

A    Yes, I did.

Q    Particularly customers at the Four Eyes Optical?

A    Um-hum, yes, I did.

Q    And coworkers with the Hanover Shoe and Wampler's?

A    Yes.

Q    And, of course, in all three of those jobs, you had to interact with supervisors?

A    Yes, I did.

Q    Throughout those jobs, were there difficulties in that interaction with people?

A    When I worked for Four Eyes, I had to be transferred from one store to another, because I could not get along with my supervisor. We could not see eye to eye with each other.

So, he transferred me - - instead of firing me, he transferred me to another store.

Q        Did you have similar difficulties at the other employments, as well?

A        When I worked for Wampler's, my supervisor and I could never see eye to eye. She would constantly stand over my back, criticize me.  If she wasn't standing over my back, she was constantly telling me I could not leave the line to use the rest room; or, if I'd miss a day, I would come in, and she would write me up.  I got into several arguments on the line with a few of the employees that worked with me.  I was constantly being wrote up for - - a big piece of meat would run down the line, she would  yell at me because it went down the line.  I didn't catch it in time.  It was just too much for me to handle with her.  We just did not see eye to eye. And I missed too much time, came back, and she told me I was fired.

Q        And why did you miss this time?

A        I suffered migraines, and I just did not feel good.  I had migraines to the point where they incapacitated me.  I got dizzy, lightheaded, my vision was blurred, I would get sick to my stomach.  I just wasn't capable of leaving.  And then, when I took my medicine, I was a zombie.  I couldn't function.  I was sleepy all the time.

                                 *                    *                    *

Q        Now, how often would you have these migraine headaches?

A        I usually get them about three times, about three times a week.

Q        That's an average?

A        Um-hum.

Q        So, this medicine that you utilize for migraine headaches, you don't take it every day?

A        No, you're not supposed to take it every day.  You take it on an onset of a migraine, is what the pill box tells you.  You take it on the onset of a headache.  Once you feel there's one coming on, you have to take it.

Q        So, then, you would have days throughout the week that you're able to function?

A        Yes.

Q        When you're not on the medicine?

A        There are some days I can function, yes.

Q        During those days that you're not having these severe migraine headaches, do you have other pains, other - -

A        I have neck pain in between my shoulder blades.  They told me I have two protruding discs, C5 and C6, in the back of my neck.  I've had neck and back trouble for a while, and it started getting worse this past March.  And I had an MRI done, and they finally told me what was causing the pain to my neck and my beck, and it was two discs that were protruding out.  And every time I move my head a certain way, I feel like I'm going to pass out.  I get dizzy.

Q        Now, how often is this pain?

A        I keep the pain.  Even though they've put me on medicine for the pain, it's not enough.  It takes some of the edge off, but it's not enough.

Q        If you were to describe to the Court the intensity of that pain on a one to 10 scale, with 10 being the highest pain level - -

A        Um-hum.

Q        - - what would you say that pain is?

A        Today, I'm at a six.  I don't feel very good today.  There are some days that the

pain would be a 10.  I would wake up - - because, I guess, I slept a different way on my neck, I would wake up; I could not get out of bed to function.  I would just lay there.

Q      Also, if you would describe that pain level with a migraine on a one to 10, how would you describe that?

A      When I get a migraine, it's a 10, because I am totally - - I'm done for.  Smell. Anything with a smell to it makes me nauseous.  Light.  Fluorescent lighting, any kind of light, hurts my eyes.   Noise.  I've got three children, and they are rowdy.  They're noise.  I have to go in my room shut the door, and tell them to leave me alone.  If my husband comes home from work and gets on me, I have to tell him to leave.  Just leave me alone.   Don't bother me.  When I have a migraine, I don't want to be messed with.

Q      Well, your medical records that have been introduced to the Court in addition to your migraine headaches and your protruding discs also indicate that you suffer from bipolar disorder.

A      Um-hum.

Q      And I believe the medical records say you have a personality disorder?  Is that true?

A      That's what they tell me.

Q      Do you have an adjustment disorder?

A      I'm not sure what that means.

Q      But that's what the medical records indicate?

A      Yeah.

Q      Acute stress disorder?

A       Yes.

Q       And that you're also an adult survivor of childhood sexual abuse.

A       Yes.

Q       Now, for this, are you receiving treatment?

A       I'm seeing Dr. Raines.

Q       And that's Dr. Fred Raines?

A       Yes.

Q       And he's with Potomac Highlands Mental Health Guild?

A       Yes.

Q       And have they also assigned a therapist to you, as well?

A       I've seen three so far, one by the name of Ken Trescott, I Care Medicine (Phonetic); and now, I'm seeing Judy Gilmore.

Q       And as part of this, are you on medications for these disorders?

A       At this time, I'm not on medicine, because they're scared some of the medications that you put - - that they will put you on, would interact with my seizure medicine, and cause me to have another seizure.  So, I haven't been on any since, I believe, May, on the Effexor.  But I have been on so many medicines from time to time that they just - - I can't - - it's numerous.  I can't tell you how many medicines I've been on.

                           *                    *                    *

Q       When was the last time you had a seizure?

A       It was March 11 when I had bit my tongue.  That's when they found out it was a seizure.  They, they went on from there after - - how I found out is, I woke up one morning with

blood all over my mouth, and I had bitten my tongue severely.  I went to the emergency room.

They said it was herpes, which was not.  I had blood work done, and showed no case of that.  I

ended up back in the hospital.  They did a CAT scan on me, and it came back that needed to stop

taking my Effexor.  They said that that could possibly have probably caused the problems that I

was having.  That was not the case.  I went to see Dr. Visalingum (Phonetic) at Harrisonburg

Medical, where he point blank flat out said he seemed to think it was a seizure, that - - he had

taken my license for six months, and said that I needed an MRI and an EEG, which came back

and said I had three arachnoid cysts on my brain, two protruding discs in the back of my neck,

and slow movement of the brain.

     Q     And that's when Dr. Raines at Potomac Highlands Mental Health Guild took you

off your mood elevators?

     A     Right?

     Q     And he's indicated that he wanted to be certain that that was not contributing to

the seizures?

     A     Right.

     Q     And you're scheduled to go back and see him about that?

     A     Yes.

     Q     Now, without that mood elevator, how is that affecting you on a day-to-day basis?

     A     I'm very moody.  I get aggravated quickly.  I have a six-year-old.  Six-year-olds

are very hyper, very - - I have to tell him to slow down, calm down, because I have to - - for me

to comprehend what he wants to do, I have to chill out, and I can't really do that to do anything

with my six-year-old son.  He's just - - I'm like him, hyper.  I get aggravated very easy.  Moody.

Excuse me for saying this, but I'm bitchy. I'm just - - just leave me alone, type situation sometimes. And my daughter's the same way. Her and I butt heads a lot because of the moods.

Q       Do you suffer from any other medical illnesses?

A       Just my neck, and my back, and my headaches, and being moody.

                         *                *                *

Q       Now, you've described to the Court various pains you have, and the intensity of those pains. Do you have pain-free days?

A       Some, yes.

Q       And those are days that you're able to function more normal?

A       We have, we have a blast. If, if, if I can function, we have a blast. We do things together. We do things in the yard. My husband will mow the grass; I'll help him, you know, as far as, you know, if he wants something to drink, I'll run in and get it. Hey, Dee, do this. We have a blast on some days. Other days, we'll take the children, and we'll go, and go for a ride, go shopping.

Q       How often do you have these pain-free days?

A       I'd say, maybe about twice, three times a week. I mean, there's - - it varies from week to week. I mean, I just - - I have my good days and my bad days.

Q       Now, how long are you able to stand without pain, if you were just to stand the whole time?

A       I have to stand up and do my dishes. I lean up against the sink. I have a hard time sitting down sometimes, so I have a Lazy-Boy chair I lounge back in. I could probably stand for maybe 15 minutes until I have to sit down again.

Q     And how about sitting here like you are now?

A     I'm uncomfortable.

Q     In what position are you most comfortable?

A     When I lay back.

Q     How long can you sit without having this discomfort?

A     Well, this is uncomfortable right now.

Q     Fifteen minutes?

A     Probably about 15 minutes, because I sat in a chair, and then, now.  And sometimes, I like - - I'd rather stand up sometimes.  It feels a little bit better, because my back is straight.

Q     How do you spend most of your days?

A     I sleep.

Q     Is that a result of the, the medication?

A     The medication makes me sleepy, makes me very drowsy.

                    *              *              *


Q     And they changed those to stronger medicines?

A     Yes.  They try to get them to where they're stronger.

Q     And why are they switching those medicines?  Are there various side effects?

A     Yes.  Some of them will make me see things I don't want to see.  I'll hallucinate.  It either makes the moods worse, not better.  Some of them make me to where I have memory loss.  I can't remember anything.  There was an incident where my husband said that it was a

whole weekend - - I had taken a new pill.  I can't remember the name of the medicine, but I had

taken it, and I didn't know where I was, who I was, what I was doing.  He said it was like

somebody different inside the household.

Q        Will you describe an average day, for the Court, in your life?

A        An average day.  I can describe yesterday for you.  Yesterday, I slept most of the

day.  My daughter had a half a day of school.  I did not realize she had come through the door.

She had to come in and wake me up.  My six-year-old was on the couch asleep.  He was taking a

nap.  She came I to wake me up, and asked me what I did today.  I didn't cook the lunch for my

little boy.  It was about 1 o'clock when she got home.  She had to wake me up to fix him lunch.

I asked her if she could do it.  I didn't feel good that day.  I had a vehicle towed yesterday.   I had

to help the guy more or less turn the wheel on the steering wheel so he could get it up on the

flatbed.  That did not go too well with me, because it was hard to steer without having it turned

on, because the front end was messed up on it.  I had hurt myself, and I told my daughter I just

did not feel good that day.  Sunday was a pretty good day.  We, we went shopping, took my son

to college.   That was - - we had a blast that day.  He's in an upward-bound program.  We had a

good time.  I didn't want to see my baby go off, but when you have a 16-year-old, you have to

do things that you don't want them to do.  Saturday - - I don't even remember what we did

Saturday.

Q        Did you try to do stuff around the house at all?

A        My house looks like a cyclone hit it.  I mean, I try and do laundry, because I don't

like anybody messing with my washer and dryer.  I'm very particular about it.  So, I try and do

my own laundry.  But there are days when my daughter says, Mom, I don't have any clean

clothes. And I'll tell her, well, you're 15 years old. Go do your own laundry.

Q       Are you able to do laundry each day?

A       Yeah, I can try and do laundry each day, because I have - - my husband has to have clean uniforms.

Q       Are you able to clean the house each day?

A       No.

Q       All right. Do you cook each day?

A       No.

Q       So, you have good days and bad days?

A       Yes. Just like yesterday, he came home from work wanting to know why dinner wasn't done. I told him to fix a hot dog.

Q       Are you able to take care of your own basic needs on a day-to-day basis, like bathing, and - -

A       There are some days I'll skip taking a shower. I've went four days without taking a shower. I just didn't feel like getting in the shower and taking a shower. I just didn't feel good.

Q       And would that be true as far as the dishes and the housework, as well?

A       The dishes will pile up, because my daughter don't help me.

Q       I want to ask you about Dr. Raines. He had in his assessment that you have a decreased concentration. Is that true?

A       I don't have very much on concentration. I, I can't comprehend things very well, and my concentration level is very low. I like to - - I don't know what you would call that.

*          *          *

Q        If you're given instructions, if your husband would leave you a note or instructions to complete tasks throughout the day, could you do that?

A        No.

Q        And why not?

A        Not all the time, no.  If it's simple, I could do it.

Q        Such as?

A        Well, if he asked me to call somebody, just like with the vehicle yesterday.  He had to remind me to make sure I got it towed to get it worked on, because they had an appointment yesterday to have the truck worked on.  Well, I didn't remember until he had said something.  He had to call me and remind me.  Well, I called Cline's (Phonetic), they came and picked up the vehicle, and it's being worked on now.

Q        Also, his assessment says you have a low energy level.  Can you explain that to the Court?

A        Energy level.  I used to be energetic.  I used to be a cheerleading coach.  Volunteer work with my daughter.  I used to be able to, as you'd say, I would do cartwheels and things like that.  I just can't do those things anymore.  The energy level's just not there.  I'm not a cheerleading coach anymore for my daughter, help her out, or anything like that, to - - I used to show her how to do back hand springs.  Instead of sending her to a gym, she wanted me to show her, you know, spot her, and stuff like that.  I cannot do that anymore.  I just don't have the energy to go out there and flip around with my daughter, or don't have the body power, either, anymore, to do that.

Q       And part of that's your pain level and the various ailments?

A       And my neck and my back.

                    *               *               *

Q       How do you react to criticism?

A       I kindly cussed one of them out.  Her name was Brenda Miller, at Wampler's.  I literally turned around - - I worked with knives.  I had to put my knives in my case, and turn around, and cuss her out.  I told her I couldn't take it anymore, and I just literally lit into her.  And I was put on a final notice with her.

Q       Dr. Raines put down that you have intense anger and rage.  Is that true?

A       Yes.

Q       And how intense does it get?

A       One night, I went to bed, and I wanted to watch TV, and Mike didn't.  I turned the TV on, and he told me to turn the TV off, and I wouldn't.  And he took the remote away from me, turned the TV off.  I took it back away from him, turned the TV on.  He took it from me.  I took the remote from him, and threw it across the room, and started beating, pardon the - - the hell out of him.  I just - - we went to a crafts store.  I used to like doing arts and crafts.  I had a 10 percent coupon that the guy would not let me use.  I told him I was going to come across the counter and, pardon my language, and bitch-slap him.  He was going to call the law on me, and I kindly left before he could call the law on me.  I didn't want to go to jail.

Q       Has your therapist been working with you on that through Potomac Highlands Mental Health Guild?

A       Yes.

Q        Do you feel there's progress being made on that?

A        Some.  I still get angry.

*                    *                    *

Q        Well, now, he also indicated you have crying spells.  Can you tell the Court about that?

A        Any simple little thing would make me cry.  If Mike would come home and say anything out of the way, I'd lose it.  If my daughter came home and told me about something at school that wasn't going right with her, I would totally lose it.  I had a crying spell Sunday.  I had to drop my son off.  I wouldn't have my son for six weeks.  I cried the whole time.  I mean, it's just - - something on TV, a commercial, something saying - - would set me off.  My grandmother called me the other day wanting me to come to Maryland.  Because I can't drive set me off.  It's just, you know, any little thing'll set me off anymore, and it used to be I would never do that.

Q        And he indicated and assessed you as having a feeling of hopelessness, helplessness, and inadequacy.  Would that all be true?

A        I feel worthless.  I feel like, because I'm disabled, I cannot help my husband out financially, physically, mentally.  I cannot clean the house.  I cannot take care of my children the way I want to.  I want to be a normal person.  I feel like that I, I can't do that, and I just feel worthless.  I feel, I feel like I've let everybody around me down.

Q        Do you have any hobbies presently?

A        I used to.  I used to crochet.  I used to love to crochet.  Anymore, it hurts my hand and my shoulder to do that.  So, I don't crochet anymore.  I used to love to read, and anymore, I

can't comprehend half of the stuff that I read.

Q        Did you used to make crafts and stuff?

A        Um-hum.  I used to make baby blankets and little crochet ornaments.  You take bottle caps - - well, it's a little ring around a bottle, pop bottle, and I used to crochet around that, and put little Christmas ornaments on it.  And hand towels, I used to crochet hand towels.

Q        Did you have a friend that had a crafts store?

A        Dawn Hott (Phonetic).

Q        And did you, last year, attempt to go volunteer for a few hours during the day - -

A        Yes.

Q        - - to help her with that?

A        She, she opened up her store in December of 2005.  Come probably about - - I think it was December of 2005 - - or, it was probably December of 2004.  December of 2004, she opened up her crafts store, and asked if I would help.  I told her, I said, it depends upon what you mean by, help.  She says, come in and help me clean and do things.  Well, come about maybe March of 2006, I finally showed up and gave her a little bit of help.  I told her I couldn't do too much as far as customers, because it probably would clash and not work out, but as far as staying in the back, and doing inventory, and working on files for her when somebody brought items in - - because she was a consignment store for crafts.  She had crafters come in, and she would take them on consignment, and sell them for her.  I told her I would take inventory, put them in a file, give them a slip, and so forth and so on.  But it didn't last very long.  Her and I didn't see eye to eye, and it kind of didn't work out.  A customer had come in, and he didn't like what was going on as far as a box that was made, and he and I got into it because he yelled at me about the way it

was, and I finally told him, if he didn't like it, he could leave, and he did.  And Dawn and I just

didn't see eye to eye on that, and I just couldn't handle the store anymore.

Q        So, even trying that, did you try that for several different days, off and on?

A        Um-hum, for several months.

Q        And you were very unsuccessful in even being able to do that?

A        It was not successful.  And she finally shut the store down.

Q        Just a few last questions.  Now, with your condition, are you able to lift?

A        No.  I'm not allowed to lift anything, they say, over 10 pounds.

Q        And if you do lift that, can you walk and carry it?

A        No, I cannot.

Q        How about pulling stuff?

A        It's hard to pull things.  I mean, I, I do, you know, have to lift things up out of the

washing machine, and put it in the dryer; and I have a dishwasher where I put my dishes and

stuff in.  And where the cabinets are in my house, some of them are too high to lift up, so I have

a stool that I have to get on to put my stuff in, because it hurts when I lift my arm up.  I mean - -

because it feels like it pulls through here, and the medicine just takes the edge off.

Q        So, you're not able to reach out?

A        Hm-mm.

Q        How about crawling?

A        No.

Q        Climbing?

A        No, I don't like to climb.   Just that little step stool, and that's it.

          \*          \*          \*

Q     And when you filed this application, you really hadn't worked since '99.  You said that you became unable to work April 1 of '03.  Is there any thing particularly significant about that date, April of '03?

A     I was in an automobile accident in February, and it took a down spiral from there on, where my primary care physician at PCC sent me to Dr. Raines, because  - -

          \*          \*          \*

EXAMINATION OF WITNESS BY ATTORNEY:

Q     Mike, state your name for the record, please.

A     Mike - -

ALJ     I guess I should let the record reflect that the claimant has been excused at her request and the request of Counsel.   You may ask.

BY ATTORNEY:

Q     Mike, state your name for the record, please.

A     It's Michael Thomas Mauzy.

Q     And you've been together with Dee for 19 years now?

A     Yes.

Q     And you all have three children?

A     Yes.

Q     The last child was born in the - - February of 2000?

A     2000.

Q     Let me invite your attention, if I may, just briefly, to the time period prior to the

birth of your last child.  What was Dee like, and what was her condition like?

A        Well, before, before that, she - - I mean, to me, she was normal.  After, after we had the kid, our last kid, her mood - - I mean, she started going downhill.  We' ve been to numerous doctors for this, and went to the hospital.  They said she was pregnant.  One of them pulled me out in the hall and said she was pregnant.  We just - - we finally figured out some of the problems, but her mood - - I mean, there'd be nights I'd come home, and I'd just walk by the - - where she was sitting at.  She'd jump out, hit me in the back.  You know, just - - I don't know.  So, I mean, from - - basically, from the pregnancy, she had complications.  They wanted her to tie the tubes due to complications.  She couldn't have no more kids.  And from that point on, it's just been a steady down decline in her moods, her abilities.  She used to - - you know, she was outgoing, she'd want to do stuff, she liked to work.  But here lately, I mean, she talks to people on the phone.  She stays at the house.  I mean, she's like a zombie.  I mean, she sleeps.  And her rage, that's one thing that worries me.  I mean, any little thing will fire her off.  And she will not quiet down or anything until she gets whatever it is off her chest.  I mean, we - - she told you about the store incident.  Therefore been baseball games we go to, her and other parents would get in numerous arguments and fights.  You'd have to break them up.  I mean, just little things would aggravate her, and they still do.   And it just progresses worse as it's went on.

*          *          *

Q        Does Dr. Raines, when you question him, give you any hopes of improvement?

A        All he told me, it'd take time.  they'd have to find the right medicine.  But he didn't give me no time frame or nothing like that.  He said, over a period of time, they might come up with something that'll balance her.

26

*          *          *

ALJ    It's not that we lack psychiatric records we lack somebody pulling this all together to try to explain to me what we have.  I asked about the distance to Harrisonburg.  I'm more than willing, as you're aware, and I'm trying to look back here to see if I'm missing anything, but I'd be happy to send her out for a full psychiatric - - maybe psychological, maybe both, for testing and a  psychiatric - - maybe psychological, maybe both, for testing and a psychiatric exam to try to pull this all together, if you think that would be helpful.  I'm not sure where she would be sent by, by the District Office.  I, I assume we have somebody - - or, they have somebody in Harrisonburg that they would send her to, but I don't know that for a fact.

ATTY Obviously, I would concur with the Court in that I recognize that, and that's why I contacted Dr. Raines and asked him to help us pull this together with the proper evaluation forms.  I can only tell the Court he assured me he would do that, and failed to do that.  So, I believe it would be of benefit - - it would be to her best interest and welfare, and of extreme benefit to the Court, to have that done.

ALJ    Dr. Raines, I can only assume, and I think that's a new name to me, probably is not as experienced in dealing with disability issues as whoever they might send her to.  Is that - -

ATTY That would probably be accurate.  He is - - of five counties, he's the only psychiatrist, and Potomac Highlands Mental Health Guide is for five counties.  The Pendleton - - the initials stand for the five counties.  He did indicate in a brief conversation in my office that he had completed those forms before, but it was very time-consuming, and  - -

*          *          *

E.      Lifestyle Evidence

The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how claimant's alleged impairments affect her daily life:

• Naps during the day and has headaches about three times per week (Tr. 82)

• Gets her children off to school in the morning and home at night (Tr. 87)

• Gets her husband ready for work in the morning (Tr. 87)

• Stays at home and takes care of the household (Tr. 88)

• Can't sleep well at night (Tr. 88)

• Cooks either complete meals or sandwiches daily (Tr. 89)

• Does the laundry and other household chores (Tr. 89)

• Goes outside everyday (Tr. 90)

• Shops for groceries (Tr. 90)

• Drives (Tr. 90)

• Able to handle a checkbook and count change, but sometimes fails to pay the bills due to forgetting or lack of funds (Tr. 90)

• Watches television, knits, dances and coaches cheerleading for her daughter (Tr. 91)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that either the Appeals Council or the ALJ erred in the handling of the psychological evidence from Thomas Stein, Ed.D.  Claimant maintains she submitted new and material evidence to the Appeals Council.  After the hearing, Claimant was sent for a consultative psychological evaluation with Dr. Stein.  Claimant avers that the ALJ erred by sending her to Dr.

Stein one and one-half years after her date of last insured and that the ALJ was obligated to re-contact her treating psychiatrist, Frederick S. Raines, M.D., rather than consult a doctor who had never even met her before the date of the one-time evaluation. Dr. Stein initially opined that Claimant could work. Claimant began seeing Dr. Stein regularly for treatment on August 15, 2006 through May 8, 2007. During this time. Dr. Stein got to know Claimant. On May 11, 2007, Dr. Stein wrote that Claimant was unable to perform substantial gainful activity, an opinion wholly inconsistent form his previous opinion, but entirely consistent with Dr. Raines' opinion. Claimant submitted this new information to the Appeals Council. However, the Appeals Council found that the records were not relevant to the period at issue. Claimant argues that the ALJ and the Appeals Council are contradicting one another because the ALJ sent her to see Dr. Stein in the first place. Therefore, Claimant avers, if the Appeals Council was correct, then it was error for the ALJ ro request and rely on irrelevant evidence in the denial of her claim. If was further error for the Appeals Council to ignore the ALJ's reliance on what the Council felt was irrelevant evidence.

Claimant next argues that the ALJ erred because he failed to consider all of her severe impairments. Claimant argues that she suffers from a number of mental conditions that could be considered as possibly "severe." The ALJ mentioned only Bipolar Disorder in his decision. Furthermore, Claimant maintains that the ALJ's RFC finding does not include all of her limitations. Also, Claimant contends that the ALJ erred by summarily deciding on his own, without VE testimony, that Claimant can work despite her mental limitations. Lastly, Claimant argues that the ALJ erred because he improperly rejected Claimant's treating psychiatrist, Dr. Raines' opinion.

Commissioner maintains that the relevant period for Claimant's claim is the period from her alleged onset date, April 1, 2003, until December 31, 2004, her date last insured for DIB.

Commissioner argues that it is this Court's role in this case to review only the ALJ's decision and not the Appeals Council's decision because when the Appeals Council denies a Claimant's request for review, the ALJ's decision is the final decision of the Commissioner. Commissioner contends the ALJ properly included Dr. Stein's findings from the July 2006 consultative examination in his decision. The Commissioner maintains that the ALJ properly relied on the state agency psychologists and Dr Raines' contemporaneous treatment notes in formulating Claimant's RFC.

Next, the Commissioner argues that substantial evidence supports the ALJ's determination at step two of the sequential evaluation. Commissioner maintains that the ALJ did not render a step two decision. Commissioner argues that the fact that the ALJ did not specifically list each sporadically diagnosed affective disorder at step two does not mean that his "not disabled" finding at step four is flawed. Commissioner maintains that it was not error for the ALJ to cite to a diagnosis of bipolar disorder as representative of Claimant's affective disorders.

Commissioner then argues that substantial evidence supports the ALJ's RFC finding. Commissioner asserts that no physician during the relevant period assessed that Claimant had physical functional limitations. Commissioner maintains that the ALJ's finding that the Claimant was limited to light work is actually more restrictive than the state agency physician's assessment that Claimant had no exertional limitations. Commissioner believes that the ALJ actually erred in Claimant's favor in assessing her physical functional limitations. Furthermore, Commissioner believes the ALJ accurately captured Claimant's mental functional limitations.

Lastly, Commissioner contends that substantial evidence supports the ALJ's determination that Dr. Raines' opinion of disability was unsupported by his own treatment notes. Commissioner avers that the ALJ, after fully examining Dr. Raines' treatments notes and the assessments of the

state agency psychologist relating to the relevant period, provided four bases for finding that Dr. Raines' opinion was unsupported and disproportionate to his evaluations.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

      5.     Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

      6.     Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

      7.     Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

      8.     Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10. <u>Social Security - Residual Functional Capacity</u>. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a

Clamant may be able to do despite their impairments.  Id.

11.    Social Security - Vocational Expert. Once it is established that a claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of other jobs are available in the national economy which the claimant can perform.  20 C.F.R. §§ 404.1520(f), 416.920(f).

12.    Social Security - Vocational Expert - Hypothetical.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[6], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

13.    Vocational Expert Purpose.  "The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996).[7]  "[R]equiring the testimony of a vocational expert is discretionary." Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981).

C.    Discussion

---

[6] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

[7] See F.N. 6.

<u>Did the ALJ Err in the Handling of the Psychological Evidence from Dr. Stein?</u>

The ALJ requested the consultative psychological evaluation conducted by Dr. Stein on July 31, 2006. The Appeals Council, in making its decision, concluded that Dr. Stein's report(s) was outside the relevant period in this case. Claimant seems concerned with the fact that the ALJ requested that Dr. Stein perform the relevant psychological testing and then relied upon in it in his decision. Claimant considers this reliance on the part of the ALJ to be erroneous because the evidence produced from Dr. Stein's evaluation of Claimant was from well after the date of last insured.

The Regulations provide that where new and material evidence is submitted to the Appeals Council and the evidence relates to the time on or before when the ALJ made his decision, the Appeals Council must "evaluate the entire record including the new and material evidence." 20 C.F.R. § 404.970(b). This does not mean the Appeals Council must grant review. <u>Id.</u> Rather, it "will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of evidence currently of record." <u>Id.</u> In <u>Wilkins v. Sec'y, Dep't of Health & Human Servs.</u>, 953 F.2d 93, 95 (4th Cir. 1991), the court held that while this Regulation imposes a mandatory duty for the Appeals Council to consider new and material evidence, the Appeals Council may still decline to review the case. Furthermore, where new and material evidence is submitted and the Appeals Council nevertheless declines review, a reviewing court should simply consider the entire administrative record, including the new material evidence, to determine whether substantial evidence supports the ALJ's decision. <u>Id.</u> at 96. <u>Wilkins</u> did not expressly address the depth of consideration the Appeals Council had to give to new and material evidence submitted to it. <u>Id.</u> at 95-96.

In Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992), the Eighth Circuit held it was not necessary for the Appeals Council to conduct an independent review of evidence submitted to it. The court noted the governing statute provides only for review of the final administrative decision, but when the Appeals Council denies review the decision of the ALJ is the final decision. Id. Therefore, the court concluded it lacked jurisdiction to review the decision of the Appeals Council. Id.

The Fourth Circuit has given conflicting precedent in unpublished opinions regarding the review the Appeals Council must give to newly submitted evidence. The court explicitly endorsed the reasoning of Browning in Hollar v. Comm'r of the Social Sec. Admin., 1999 U.S. App. LEXIS 23121, at *3 (4th Cir.) (holding that "We agree with [Browning]"). The court again seemed to endorse Browning in Freeman v. Halter, 15 Fed. Appx. 87, 89 (4th Cir. 2001). However, in Thomas, 24 Fed. Appx. at 162, the Fourth Circuit held a bare explanation by the Appeals Council that it rejected additional evidence was insufficient. In Thomas, the claimant submitted additional evidence from a treating physician who conducted an examination after the administrative hearing. Id. The Appeals Council summarily denied review, noting it found nothing significant about the new evidence. Id. However, the record was unclear that the doctor was a treating physician until oral argument on appeal. Id. The court found itself unable to review the administrative decision without clarification that the Appeals Council knew the doctor was a treating physician. Id. The court determined clarification on this point was especially important because of the significance of the treating physician rule, which requires the opinions of treating physicians be given great weight. Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) and Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987)). The court

ordered the case remanded.  Id.

A published Fourth Circuit opinion is ambiguous on the need of the Appeals Council to consider newly submitted evidence.  In Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980), the claimant submitted a new psychiatric report and a new chiropractic report to the Appeals Council.  The Appeals Council noted it received the items, but did not elaborate.  Id.  The Fourth Circuit noted the chiropractic report was largely duplicative of other evidence and so did not need to be considered.  Id.  On the other hand, the psychiatric report presented new and material evidence and so should have been the subject of detailed findings.  Id.  The court found the failure to make specific findings a basis for remand.  Id.

Lower courts within the Fourth Circuit have also given conflicting precedent on this issue.  In King v. Barnhart, 415 F. Supp. 2d 607, 610-12 (E.D.N.C. 2005), the court held that where new evidence is submitted to the Appeals Council and the Appeals Council does not make an independent evaluation, the proper course is to simply evaluate the record as a whole, including the new evidence, to determine whether there is substantial evidence to support the administrative decision.  The court reached this conclusion after a detailed evaluation of Fourth Circuit precedent.  Id.  It concluded from that precedent that where the new evidence does not undermine the administrative decision, the Fourth Circuit affirms, but where the new evidence does make substantial evidence lacking, it remands for further consideration.  Id.  Another court agreed with the Browning decision in Jackson v. Barnhart, 368 F. Supp. 2d 504, 508 n. 2 (D.S.C. 2005).  The court noted the new evidence submitted contradicted the record.  Id.  On the other hand, some courts have held that where the Appeals Council incorporates new evidence into the record, the absence of an explanation of the weight given to the evidence necessitates remand

since it is the function of the administrative adjudicators to weigh the evidence. Scott v. Barnhart, 332 F. Supp. 2d 869, 877-79 (D. Md. 2004); Harmon v. Apfel, 103 F. Supp. 869, 872-74 (D.S.C. 2000); Riley v. Apfel, 88 F. Supp. 2d 572, 579-80 (W.D. Va. 2000).

This Court is persuaded by the decision in King. The King court has properly viewed the issue in accord with Fourth Circuit precedent and that where the Appeals Council incorporates new evidence into the record but does not make specific findings regarding it, a reviewing court should simply weigh all the evidence to determine if substantial evidence exists. First, this approach accords with the Fourth Circuit's published precedent of Myers. The court there found no fault in the Appeals Council not evaluating cumulative evidence, but ordered remand where there was no explanation concerning new and material evidence. Myers, 611 F.2d at 983. The new and material evidence not evaluated by Commissioner meant the decision lacked substantial evidence. This approach also reconciles the Thomas and Hollar decisions. The Thomas court was careful to point out the special significance of the how the treating physician rule meant the new evidence undermined confidence in the administrative decision. Thomas, 24 Fed. Appx. at 162. On the other hand, when the Hollar court made a broad statement that the Appeals Council is not required to analyze new evidence, there was no evidence in the opinion that the new evidence would have changed the outcome. Hollar, 1999 U.S. App. LEXIS 23121, at *3.

In this case, the Appeals Council's opinion referenced evidence in an enclosed order. (Tr. 7). The Appeals Council did not, however, make this new evidence part of the record before this Court because it was found to be irrelevant to the period at issue.[8] (Id.). Thus, it is obvious

---

[8] Claimant filed a subsequent application for supplemental security income benefits under Title XVI of the Social Security Act on March 31, 2007. That claim was denied initially and the appeal was pending at the time of the Appeals Council's decision to not review the case currently before the Court. The Appeals Council sent the Dr. Stein evidence to the Morgantown

the Appeals Council considered the evidence. Under the law as explained above, the Court must now determine whether substantial evidence exists to support the ALJ's decision in spite of the new report. The Court does not believe the ALJ's action of consulting Dr. Stein and relying on the report in his opinion constitutes reversible error. Unless, of course, substantial evidence did not otherwise support the ALJ's conclusion. This question will be discussed below. For the reasons that follow, the Court concludes substantial evidence exists and so the ALJ should be affirmed.

Did the ALJ Err Because He Failed to Consider All of Claimant's Severe Impairments?

Claimant contends that the ALJ failed to consider all of her severe impairments at step two of the sequential evaluation process. Claimant is particularly concerned with the fact that the ALJ found her only severe impairment to be bipolar disorder, despite the fact that she suffered from other mental disorders. Specifically, Claimant believes it was error on the part of the ALJ to ignore her Post Traumatic Stress Disorder as well as her Personality Disorder. Claimant argues that the ALJ was under a duty say that he did not believe these disorders were severe impairments and explain why.

At step two of the sequential evaluation process, the ALJ is required to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. § 404.1520(c). A severe impairment is "one which impacts more than minimally on an individual's functional ability to perform basic work activities." Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). In order to properly evaluate the

hearing office for association with Claimant's Title XVI claim.

severity of mental impairments, the ALJ must consider the factors contained in section 12.00 of the Listing of Impairments in Appendix 1.  The factors contained in section 12.00 are separated into four broad functional areas in which the Commissioner rates the degree of claimant's functional limitations, specifically, 1) activities of daily living; 2) social functioning; 3) concentration, persistence or pace; and 4) episodes of decompensation.  20 C.F.R. § 404.1520(a).

Commissioner argues that the ALJ did not render a step two decision and that the ALJ properly determined Claimant's RFC and found at step four she was not disabled.  The Court believes Commissioner's argument is misguided here.  The ALJ did, in fact, render a decision at step two.  He determined that Claimant had a severe impairment, namely, Bipolar Disorder.  It was this finding that guided the ALJ through the remainder of the steps in the process.  By summarily dismissing Claimant's various other diagnoses at step two with nary a word, the ALJ needed only to determine whether this one severe impairment met a listing at step three.  However, the ALJ rectified his error by discussing Claimant's activities of daily living and her social functioning when making his RFC finding at step four.

The ALJ acknowledged that Claimant was diagnosed with acute stress disorder, an adjustment disorder, obsessive compulsive traits, and PTSD, and that she complained about anxiety, depression, and anger.  (Tr. 26-27).  The ALJ also listed the medications, including anti-depressants, anti-anxiety medications and mood stabilizers, taken by Claimant.  (Tr. 27).  Furthermore, Dr. Raines' diagnoses, cited by Claimant in her brief, are found in a letter from Dr. Raines to Claimant's attorney which is dated July 11, 2005.  The ALJ discusses this letter, as well as another letter written by Dr. Raines to Claimant's attorney dated October 3, 2005.  In that letter, as the ALJ correctly points out, Claimant's bipolar disorder was diagnosed on April 21,

2005.  The ALJ notes that there was no evidence that the Claimant had been diagnosed with bipolar disorder prior to the date last insured.  (Id.).  Therefore, it cannot be said that the ALJ overlooked, or simply ignored all of Claimant's mental impairments.  He recognized them in his opinion and was under no duty to specifically list them and explain why they did not meet the test for severity under step two.  The Court finds that the ALJ's failure to discuss all of Claimant's diagnosed disorders at step two to be harmless because he was cognizant of these disorders when making his RFC formulation, which, consequently, was supported by substantial evidence.

### Did the ALJ Err Because the RFC Finding in the Decision Does Not Include All of Claimant's Limitations?

Claimant argues that the ALJ's RFC finding does not include all of her limitations. Specifically, Claimant maintains that the ALJ's finding limiting her to light work cannot be reconciled with the fact that he found only bipolar disorder, a mental disorder, to be her only severe impairment.  Claimant also finds it troubling that the ALJ's RFC finding included no mental limitations.  Claimant argues that the ALJ basically made up the RFC, which was not supported by the record as a whole and did not include all of her limitations.

The ALJ found that Claimant had the RFC to perform the full range of light work. Claimant believes that her physical RFC was even more limited to light work.  It is not the role of this Court to assess the merits of this particular argument, but the Court notes that, aside from the Claimant's complaints of pain, there was no evidence submitted tending to show any physical impairments that would preclude Claimant from performing at least light work.

The RFC is what Claimant can still do despite her limitations.  20 C.F.R. § 404.1545.  It

41

is an assessment based upon all of the relevant evidence.  Id.  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  Id.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as a basis for determining the particular types of work a claimant may be able to do despite his impairments.  Id.

The Regulations define light work as the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  The Regulations further provide that "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.  A person must "have the ability to do substantially all of these activities" for an ALJ to find her capable of a significant amount of light work.  Id.

The Regulations define sedentary work as the ability to lift "no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 404.1567(a).  A sedentary position may involve occasional walking and standing.  Id.

In this case, the ALJ made a RFC assessment based on several factors, including Claimant's testimony, her education, activities of daily living, reports of consulting physicians as well as his review of the medical record.  (Tr. 25-29).  The ALJ determined Claimant could

perform the full range of light work.  (Tr. 25).  Claimant was limited to simple, repetitive work.

(Id.).  The ALJ's finding will be upheld as long as it is supported by substantial evidence.  <u>Hays</u>,

907 F.2d at 1456.

In this case, the RFC was supported by substantial evidence.  Claimant estimated that she

can stand about 15 minutes and sit about 15 minutes due to back pain.  Claimant regularly gets

her children ready for school and her husband ready for work.  She helps her children with their

homework in the evening and has no problems with her personal care.  She prepares meals,

launders, and cleans the house.  (Tr. 26).  Claimant's mental status examinations were within

normal limits.  She showed improvement with medications.  The ALJ did not find Claimant to be

entirely credible.  He stated that the record supports some of her complaints, but there are no

findings to support the extent of her disabling allegations.  (Tr. 28).  The treatment records

indicate mild to moderate symptoms and she was improving with treatment.  (Id.).  Her

allegations are also undermined by her activities of daily living, some of which were outlined

above.

This Court cannot say that, in light of the evidence of record and the evidence outlined in

the ALJ's decision, there was not substantial evidence supporting the ALJ's determination of

Claimant's RFC.  Therefore, he did not err when he found that she had the RFC to perform a full

range of light work.

<u>Did the ALJ Err Because He Improperly Rejected the Treating Psychiatrist's Opinion?</u>

Claimant contends that the ALJ improperly rejected Claimant's treating psychiatrist's

opinion.  Claimant maintains that the ALJ "outright rejected" Dr. Raines' opinions.

"Although it is not binding on the Commissioner, a treating physician's opinion is

entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

Therefore, the inquiry facing this Court, is whether substantial evidence exists to rebut Dr. Raines' opinion. The Court notes initially that Dr. Raines' records may not even constitute substantial evidence to support a finding that Claimant is disabled. Dr. Raines submitted three letters, the first of which was written long after Claimant's date of last insured. In that letter, Dr. Raines opined that Claimant was a "poor candidate" for regular employment at that time. (Tr. 203). Upon being prompted by Claimant's counsel, Dr. Raines wrote another letter. In it, he opined, for the first time, that Claimant's "disabling condition was certainly prior to 12/31/2004." (Tr. 265).

Particularly troubling to Claimant was the ALJ's finding that "...matters of disability are reserved to the Commissioner (SSR 96-5p)." (Tr. 27). The Court cannot see why this is so puzzling to the Claimant here. The law is well settled and the ALJ correctly applied it here. A doctor's finding that a patient is "disabled" in the medical context does not always translate to a finding of disability in a social security case. The ALJ considered Dr. Raines' reports and his opinion letters and found his opinion was "not supported by his medical reports, which indicate mild to moderate symptoms and seems grossly disproportionate to the actual evaluation. Therefore, I accord it very little weight." (Tr. 29). This Court agrees with the ALJ and finds that not only did Dr. Raines' opinions conflict with his own records, they conflicted with other substantial evidence in the record that tends to support the ALJ's ultimate finding that Claimant is not disabled. Therefore, persuasive contradictory evidence existed to rebut Dr. Raines' opinion that Claimant was disabled and the ALJ did not err. His decision was supported by

substantial evidence.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence exists to support the ALJ's decision.  Specifically, the ALJ's handling of the psychological evidence from Thomas Stein, Ed.D. was not cause for remand.  Furthermore, the ALJ considered all of Claimant's severe impairments; his RFC finding included all of Claimant;s limitations; and he did not improperly reject the treating psychiatrist's opinion.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: June 12, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE